Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:    516.741.4977
Facsimile:    516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAIN LINE CAPITAL INVESTMENTS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>COREPOINT LODGING INC., KEITH A. CLINE, JAMES R. ABRAHAMSON, GLENN ALBA, JEAN M. BIRCH, ALAN J. BOWERS, GIOVANNI CUTAIA, ALICE E. GOULD, B. ANTHONY ISAAC, BRIAN KIM, DAVID LOEB, and MITESH B. SHAH,<br><br>Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1) Breach of Fiduciary Duties<br>(2) Aiding and Abetting Breach of Fiduciary Duties<br>(3) Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(4) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Main Line Capital Investments, LLC ("Plaintiff"), by and through its attorneys, alleges upon information and belief, except for those allegations that pertain to it, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.    Plaintiff brings this stockholder action against CorePoint Lodging Inc. ("CorePoint" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for breaches of fiduciary duty and violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of

1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Cavalier Acquisition JV LP ("Parent") through merger vehicle Cavalier Acquisition Owner LP ("Merger Sub" and collectively with Parent, "Cerberus") as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a November 8, 2021, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Cerberus will acquire all the outstanding shares of CorePoint common stock for $15.65 per share in cash. As a result, CorePoint will become an indirect wholly-owned subsidiary of Cerberus.

3.      Thereafter, on December 17, 2021, CorePoint filed a Preliminary Proxy Statement on Form PREM14A attaching the proxy statement (the "Preliminary Proxy Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the Preliminary Proxy Statement reveals that the sales process, and the entirety of CorePoint's existence as a standalone company, has been mired in an ongoing audit from the Internal Revenue Service ("IRS") which, as admitted by the Company in the Preliminary Proxy Statement, will likely result in a payment to the IRS of approximately $160 million (the "IRS Matter").

5.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell CorePoint without first taking steps to ensure that Plaintiff in its capacity as a public Company

stockholder would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or CorePoint without regard for Plaintiff in its capacity as a public Company stockholder. Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Plaintiff in its capacity as a public Company stockholder.

6.      Furthermore, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff, as well as the Company's public stockholders. For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

7.      In violation of the Exchange Act and in further breach of their fiduciary duties, Defendants caused to be filed the materially deficient Preliminary Proxy Statement with the SEC on December 17, 2021 in an effort to Plaintiff, to vote in favor of the Proposed Transaction. The Preliminary Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in violation of the Exchange Act and in breach of the Defendants' fiduciary duties. As detailed below, the Preliminary Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for CorePoint, provided by CorePoint management to the Board and the Board's financial advisors J.P. Morgan Securities, LLC ("J.P. Morgan") and Hodges Ward Elliot, LLC ("HWE") and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by J.P.

Morgan and/or HWE, if any, and provide to the Company and the Board.

8.    Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages suffered by Plaintiff resulting from violation of the federal securities laws by Defendants.

## PARTIES

9.    Plaintiff is a Pennsylvania limited liability company and a CorePoint stockholder.

10.    Defendant CorePoint is the only pure-play publicly traded U.S. lodging REIT strategically focused on the ownership of midscale and upper-midscale select-service hotels. CorePoint is incorporated under the laws of Maryland and has its principal place of business at 125 E. John Carpenter Freeway, Suite 1650, Irving, TX 75062. Shares of CorePoint common stock are traded on the New York Stock Exchange under the symbol "CPLG."

11.    Defendant Keith A. Cline ("Cline") has been a director of the Company at all relevant times. In addition, Cline serves as the Company's President and Chief Executive Officer ("CEO").

12.    Defendant James R. Abrahamson ("Abrahamson") has been a director of the Company at all relevant times.

13.    Defendant Glenn Alba ("Alba") has been a director of the Company at all relevant times.

14.    Defendant Jean M. Birch ("Birch") has been a director of the Company at all relevant times.

15.    Defendant Alan J. Bowers ("Bowers") has been a director of the Company at all relevant times.

16.    Defendant Giovanni Cutaia ("Cutaia") has been a director of the Company at all relevant times.

17.    Defendant Alice E. Gould ("Gould") has been a director of the Company at all relevant times.

18.    Defendant B. Anthony Isaac ("Isaac") has been a director of the Company at all relevant times.

19.    Defendant Brian Kim ("Kim") has been a director of the Company at all relevant times.

20.    Defendant David Loeb ("Loeb") has been a director of the Company at all relevant times.

21.    Defendant Mitesh B. Shah ("Shah") has been a director of the Company at all relevant times.

22.    Defendants identified in ¶¶ 11 - 21 are collectively referred to as the "Individual Defendants."

23.    Non-Party Cerberus is a global leader in alternative investing with over $55 billion in assets across complementary credit, private equity, and real estate strategies. Cerberus was founded in 1992 and headquartered in New York, NY.

24.    Non-Party Merger Sub is a wholly owned subsidiary of Cerberus created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to

confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

26.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the NYSE which is headquartered in this District.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

28.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with CorePoint and owe the public stockholders of the Company, including Plaintiff, the duties of due care, loyalty, and good faith.

29.     By virtue of their positions as directors and/or officers of CorePoint, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause CorePoint to engage in the practices complained of herein.

30.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company public stockholders including Plaintiff. To diligently comply with these duties, directors of a corporation must:

   a.   act with the requisite diligence and due care that is reasonable under the circumstances;

    b.  act in the best interest of the Company and its public stockholders, including Plaintiff;

    c.  use reasonable means to obtain material information relating to a given action or decision;

    d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the Company and the fulfillment of any other roles or their personal affairs;

    e.  avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

    f.  disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the Company.

31.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of CorePoint, are obligated to refrain from:

    a.  participating in any transaction where the directors' or officers' loyalties are divided;

    b.  participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders including Plaintiff; and/or

    c.  unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders including Plaintiff.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff as a public stockholder of CorePoint, including their duties of loyalty, good faith, and due care.

33.     As a result of the Individual Defendants' divided loyalties, Plaintiff will not receive adequate, fair or maximum value for his CorePoint common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

34.     CorePoint, a real estate investment trust company, owns select-service hotels primarily under the La Quinta brand in the United States. As of December 31, 2020, it had a portfolio of 209 select-service hotels and approximately 27,800 rooms across 35 states in the United States. The Company has elected to be taxed as a real estate investment trust. As a result, it would not be subject to corporate income tax on that portion of its net income that is distributed to shareholders. CorePoint was incorporated in 2017 and is headquartered in Irving, Texas.

35.     The Company's most recent financial performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated impressive financial success.   For example, in the August 5, 2021 press release announcing its 2021 Q2 financial results, the Company highlighted Net income of $28 million or $0.48 earnings per diluted share, Comparable RevPAR of $58.99, an increase of 137.8% from the same period in 2020 and a decrease of 14.7% from the same period in 2019, and Adjusted EBITDAre of $31 million.

36.     Speaking on the positive results, CEO Defendant Cline said, "'The performance of our select service, leisure focused hotels has strengthened as we have moved through our historical

peak season in the second and third quarters," noted Keith Cline, President and Chief Executive Officer of CorePoint. "This positive momentum has allowed us to capture the pent up demand in suburban, drive-to destination, and interstate-adjacent markets resulting in $35 million of hotel Adjusted EBITDAre in the second quarter. Our non-core disposition program has been accelerating throughout 2021 as we have closed on the sale of 42 assets for $229 million in gross proceeds year to date and have an additional 37 hotels under contract expected to generate an additional $234 million in gross proceeds. Since the inception of our real estate disposition strategy, we have either sold or put under contract over 85% of the 210 hotels we identified as non-core.'"

37.    The sustained financial success and impressive results are not an anomaly, but rather, are indicative of a trend of continued future potential success by CorePoint. Clearly, based upon the positive outlook, the Company is likely to have tremendous future success.

38.    Despite this upward trajectory, the Individual Defendants have caused CorePoint to enter into the Proposed Transaction without providing requisite information to CorePoint stockholders such as Plaintiff.

***The Flawed Sales Process***

39.    As detailed in the Preliminary Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.

40.    Notably, the Preliminary Proxy Statement fails to give adequate information regarding the IRS Matter, which originates from the Company's 2018 spinoff from La Quinta Holdings Inc., and is likely to result in up to approximately $160 million owed by the Company to

the IRS. Such a significant ongoing governmental investigation and large penalty fee has had material impacts on the sales process and more information regarding the IRS Matter must be disclosed.

41.    Additionally, the Preliminary Proxy Statement fails to provide adequate information as to whether the "Capital Committee" described in the Preliminary Proxy Statement was a special committee of the Board composed of independent, disinterested Board members and which was charged with running the sales process. Moreover, if the Capital Committee was such a special committee, the Preliminary Proxy fails to provide adequate information regarding its powers; conversely, if the Capital Committee was not such a special committee, the Preliminary Proxy fails to provide adequate information regarding why the Board did not create a committee of independent and disinterested directors to run the sales process.

42.    The Preliminary Proxy Statement also fails to provide adequate information as to why HWE was engaged in addition to J.P. Morgan to serve as a second financial advisor, fails to provide adequate information regarding HWE's role considering it did not submit a fairness opinion, and fails to disclose the total amount of consideration that HWE will receive in exchange for its financial advisory services related to the Proposed Transaction.

43.    In addition, the Preliminary Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Cerberus, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Preliminary Proxy Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

44.    It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

45.    On November 8, 2021, CorePoint issued a press release announcing the Proposed Transaction. The press release stated, in relevant part:

> **IRVING, Texas, November 8, 2021** – CorePoint Lodging Inc. (NYSE: CPLG) ("CorePoint" or the "Company"), a pure play select-service hotel owner strategically focused on the midscale and upper-midscale segments, today announced that it has entered into a definitive agreement to be acquired through a joint venture between affiliates of Highgate and Cerberus Capital Management, L.P. ("Cerberus").
>
> Under the terms of the merger agreement, Highgate and Cerberus will acquire all outstanding shares of CorePoint common stock in an all-cash transaction valued at approximately $1.5 billion based on the $15.65 per share consideration, which reflects the assumption of current net debt and a $160 million buyer liability reserve for the Internal Revenue Service ("IRS") matter detailed below. This price represents a premium of approximately 42% to CorePoint's closing share price on July 13, 2021, the last trading day prior to the Company's public announcement of its strategic alternatives process.
>
> In addition to the $15.65 per share payable in cash at closing, CorePoint stockholders may receive incremental cash consideration per share pending timely resolution of the previously disclosed tax proceedings with the IRS related to an ongoing audit of CorePoint entities, which began prior to the Company's 2018 spin-off from La Quinta Holdings, Inc. The amount of any potential additional cash consideration payable to CorePoint stockholders will be calculated based on the amount, if any, by which the settlement amount is less than a buyer liability reserve of $160 million agreed to by the parties. The Company received a settlement offer from the IRS with respect to the IRS matter on November 5, 2021, and expects to accept that offer and enter into an agreement with the IRS this week. The settlement offer provides for total payments by the Company of approximately $89.6 million plus statutory interest through the date of payment. Pursuant to this settlement offer, the Company estimates the total payment amount pursuant to the settlement will be approximately $155 million. As such, the Company currently expects that the amount of any such additional consideration will likely be approximately $0.10 per share. There can be no assurances that any additional consideration will be received by the Company's stockholders.
>
> Keith Cline, President and Chief Executive Officer of CorePoint, said, "Over the past few years, CorePoint has been executing on a disciplined asset disposition

strategy that has transformed the Company's portfolio and created substantial value. This transaction continues our strategy of maximizing value and represents a compelling opportunity to deliver immediate and certain cash value to our stockholders. Our portfolio has accomplished a great deal over the past several years, and I would like to thank the entire team at CorePoint along with Wyndham, especially their operations field leaders, general managers and hotel staff, for the dedication, hard work and commitment to CorePoint."

Mitesh Shah, CorePoint's Chairman of the Board, added, "The CorePoint Board, in consultation with our independent financial and legal advisors, conducted a comprehensive review of strategic alternatives and unanimously determined that this transaction maximizes value for our stockholders. The resilience and achievements of CorePoint's entire team have unlocked substantial value through a deliberate, non-core disposition strategy, and today's all-cash sale represents a successful culmination of these efforts."

"Highgate has tremendous respect for CorePoint and its highly experienced team, having observed the Company strengthen, refine and cultivate a leading portfolio of select service hotels," said Mahmood Khimji, Co-Chairman of Highgate. "We are thrilled to partner with our friends at Cerberus on another exciting transaction, through which Highgate will continue to enhance its capabilities in the select service space. We look forward to collaborating with the many associates and stakeholders involved towards a successful closing, and to working closely with the Wyndham Hotels team as we embark on the next chapter for this portfolio."

Tom Wagner, Head of North American Real Estate at Cerberus, commented: "Since separating from La Quinta Holdings, Inc. in 2018, the CorePoint management team has done an excellent job running the business, navigating the unprecedented COVID-19 pandemic, and strategically repositioning its portfolio. Alongside Highgate, we are excited for the opportunity to build on these positive strides and establish the Company's next chapter of growth as a private company."

Timing and Approvals

The transaction is expected to close in the first quarter of 2022, subject to the approval of CorePoint's stockholders and the satisfaction of other customary closing conditions. There is no financing condition to the transaction.

In connection with the transaction, affiliates of Blackstone Inc. which own approximately 30% of CorePoint's total shares outstanding, have entered into a voting agreement under which they have agreed to vote all of their shares in favor of the transaction.

Upon successful completion of the transaction, CorePoint's common stock will no longer be listed on the New York Stock Exchange, and the Company will be privately owned.

***The Inadequate Merger Consideration***

46.     Significantly, the Company's financial prospects, opportunities for future growth, and investment in innovation establish the inadequacy of the merger consideration.

47.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company. The proposed valuation does not adequately reflect the intrinsic value of the Company.

48.     Moreover, post-closure, Plaintiff will be frozen out of his ownership interest in the Company and will not be able to reap the rewards of the Company's future prospects.

49.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Cerberus at the expense of CorePoint stockholders, including specifically Plaintiff, which clearly indicates that Plaintiff in his capacity as a CorePoint stockholder was not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

50.     The Merger Agreement contains certain provisions that unduly benefit Cerberus by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that is especially onerous and impermissible. Notably, in the event of termination, the merger agreement requires CorePoint to pay up to $29 million to Cerberus, if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, CorePoint must pay this termination fee even if it consummates any competing Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination

fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

51.     The Merger Agreement also contains a "No Solicitation" provision that restricts CorePoint from considering alternative acquisition proposals by, *inter alia*, constraining CorePoint's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide acquisition proposal if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

52.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide Cerberus information in order to match any other offer, thus providing Cerberus access to the unsolicited bidder's financial information and giving Cerberus the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Cerberus.

53.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests Plaintiff in its capacity as a public Company stockholder.

54.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

55.     The breakdown of the benefits of the deal indicate that CorePoint insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as

Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of CorePoint.

56.     Notably, Company insiders, currently own large, illiquid portions of Company stock, all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction. However, while the Preliminary Proxy Statement provides the following information, it fails to disclose an accounting of how much merger consideration will be afforded to Company insiders as a consequence of the consummation of the Proposed Transaction and the cashing out of these amounts:

| Name of Beneficial Owner | Number | Percentage of Common Stock |
|---|---|---|
| **Beneficial Owners of More than 5%:** | | |
| Blackstone[1] | 17,586,538 | 30.2% |
| The Vanguard Group[2] | 4,353,485 | 7.5% |
| Donald Smith & Co., Inc.[3] | 4,819,267 | 8.3% |
| Blackrock, Inc.[4] | 4,501,058 | 7.7% |
| Cetus Capital VI, L.P. and OFM II, L.P.[5] | 4,201,172 | 7.2% |
| **Directors and Executive Officers:** | | |
| Keith A. Cline[6] | 980,551 | 1.7 |
| Mark M. Chloupek[6] | 324,383 | * |
| Daniel E. Swanstrom II[6]. | 234,186 | * |
| James R. Abrahamson[7] | 27,421 | * |
| Glenn Alba | 20,699 | * |
| Jean M. Birch[8] | 16,750 | * |
| Alan J. Bowers | 26,577 | * |
| Giovanni Cutaia[9] | 0 | — |
| Alice E. Gould | 16,750 | * |
| B. Anthony Isaac | 17,611 | * |
| Brian Kim[9] | 0 | — |
| David Loeb | 25,815 | * |
| Mitesh B. Shah | 42,916 | * |
| **All directors and executive officers as a group (13 persons)** | **1,733,939** | **3.0%** |

57.     In addition, Company insiders currently own company options, restricted stock units, and other equity awards, all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction. However, the Preliminary Proxy Statement fails

to provide an accounting of the amount of these equity awards or how much consideration they will be exchanged for.

58.    Further, certain employment agreements with certain CorePoint executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

| Name | Cash (1) ($) | Equity (2) ($) | Perquisites / Benefits (3) ($) | Tax Reimbursement (4) ($) | Total ($) (5) |
|------|------|------|------|------|------|
| Keith A. Cline | 6,564,319 | 26,438,765 | 117,523 | — | 33,120,606 |
| Daniel E. Swanstrom II | 2,968,750 | 8,761,138 | 37,571 | — | 11,767,459 |
| Mark M. Chloupek | 2,575,000 | 8,279,538 | 81,682 | $                 0 | 10,936,220 |

59.    The Preliminary Proxy Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

60.    Thus, while the Proposed Transaction is not in the best interests of CorePoint, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Preliminary Proxy Statement***

61.    On December 17, 2021, the CorePoint Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy Statement that, in violation the Exchange

Act and in breach of their fiduciary duties, failed to provide Plaintiff in its capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

62.     Specifically, the Preliminary Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy Statement fails to disclose:

　　　　a.  Adequate information regarding the IRS Matter, including but not limited to, the affect it had on the sales process;

　　　　b.  Adequate information as to whether the "Capital Committee" described in the Preliminary Proxy Statement was a special committee of the Board composed of independent, disinterested Board members and which was charged with running the sales process;

　　　　　　i.  Adequate information regarding the Capital Committee's powers if it was such a special committee;

　　　　　　ii.  Adequate reasoning why no committee of independent and disinterested Board members was created to run the sales process, if the Capital Committee was not such a special committee;

　　　　c.  The specific reasoning why HWE was engaged as a financial advisor in addition to J.P. Morgan;

d.   Adequate information as to HWE's role as a financial advisor including specific reasoning as to why it did not submit a fairness opinion despite being engaged as a financial advisor;

e.   The total amount of consideration that HWE will receive in exchange for its financial advisory services related to the Proposed Transaction;

f.   Whether the confidentiality agreements entered into by the Company with Cerberus differed from any other unnamed confidentiality agreement entered into between the Company and potentially interested third parties (if any), and if so, in all specific manners;

g.   All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including Cerberus, would fall away; and

h.   Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of Plaintiff and Company stockholders.

*Omissions and/or Material Misrepresentations Concerning CorePoint's Financial Projections*

63.    The Preliminary Proxy Statement fails to provide material information concerning financial projections for CorePoint provided by CorePoint management to the Board, J.P. Morgan, and/or HWE and relied upon by J.P. Morgan in its analyses.  The Preliminary Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

64.    Notably the Preliminary Proxy Statement reveals that as part of its analyses, J.P. Morgan reviewed, "certain internal financial analyses and forecasts prepared by the management of CorePoint relating to its business."

65.    Therefore, the Preliminary Proxy Statement should have, but fails to provide, certain information in the projections that CorePoint management provided to the Board, J.P. Morgan, and/or HWE.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007)

66.    With regard to the *CorePoint Projections* prepared by CorePoint Management, the Preliminary Proxy Statement fails to disclose material line items for the following metrics:

>    a.  Hotel Adjusted EBITDAre, including all underlying necessary metrics, adjustments, and assumptions, including specifically: recurring property-level expenses;

      b.   Adjusted EBITDAre, including all underlying necessary metrics, adjustments, and assumptions, including specifically: recurring corporate-level expenses; and

      c.   Unlevered Free Cash Flows, including all underlying necessary metrics, adjustments, and assumptions, including specifically: equity-based compensation expense and capital expenditure allowances.

67.     The Preliminary Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

68.     This information is necessary to provide Plaintiff in its capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

69.     Without accurate projection data presented in the Preliminary Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of J.P. Morgan's financial analyses, or make an informed decision whether to vote in favor of the Proposed Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by J.P. Morgan*

70.     In the Preliminary Proxy Statement, J.P. Morgan describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for,

underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

71.     With respect to the *Public Trading Multiples* analysis, the Preliminary Proxy Statement fails to disclose the following:

    a.   The specific metrics for each selected public company analyzed; and

    b.   The specific inputs and assumptions used to determine the selected reference range of 10.0x – 12.5x for EV/2019 Corporate adjusted cash EBITDA;

    c.   The specific inputs and assumptions used to determine the selected reference range of 13.5x – 14.5x for EV/2022E Corporate adjusted cash EBITDA.

72.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy Statement fails to disclose the following:

    a.   The terminal values calculated;

    b.   The specific inputs and assumptions sued to determine the utilized perpetual growth rate range of 2.0% to 3.0%;

    c.   The specific inputs and assumptions sued to determine the utilized discount rate range of 9.50% to 10.50%;

    d.   CorePoint's weighted average cost of capital;

    e.   The specific net debt for CorePoint as of September 30, 2021 utilized; and

    f.   The specific other adjustments for CorePoint as of September 30, 2021 utilized.

73.     These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

74.     Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes its value

and serves its interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in its best interests as a public CorePoint stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

**FIRST COUNT**

**Breach of Fiduciary Duties**

**<u>(Against the Individual Defendants)</u>**

75.     Plaintiff repeats all previous allegations as if set forth in full herein.

76.     The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff in its capacity as a Company public stockholder.

77.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff of the true value of its investment in CorePoint.

78.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the Plaintiff in its capacity as a Company public stockholder by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of the Company to Plaintiff in its capacity as a Company public stockholder.

79.     Indeed, Defendants have accepted an offer to sell CorePoint at a price that fails to reflect the true value of the Company, thus depriving Plaintiff in its capacity as a Company public stockholder of the reasonable, fair and adequate value of its shares.

80.     Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff in its capacity as a Company public stockholder all material information necessary for it to make an informed decision on whether to vote its shares in favor of the Proposed Transaction.

81.     The Individual Defendants dominate and control the business and corporate affairs of CorePoint, and are in possession of private corporate information concerning CorePoint's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and Plaintiff in its capacity as a Company public stockholder which makes it inherently unfair for them to benefit their own interests to the exclusion of Plaintiff.

82.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff in its capacity as a Company public stockholder.

83.     As a result of the actions of the Individual Defendants, Plaintiff in its capacity as a Company public stockholder will suffer irreparable injury in that it has not and will not receive its fair portion of the value of CorePoint's assets and has been and will be prevented from obtaining a fair price for its holdings of CorePoint common stock.

84.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff in its capacity as a Company public stockholder, all to the irreparable harm of the Plaintiff.

85.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### (Against Defendant CorePoint)

86.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

87.    Defendants CorePoint, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

88.    As a result this conduct, Plaintiff in its capacity as a Company public stockholder will suffer irreparable injury in that it has not and will not receive its fair portion of the value of CorePoint's assets and has been and will be prevented from obtaining a fair price for its holdings of CorePoint common stock.

89.    Plaintiff has no adequate remedy at law.

## THIRD COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

90.    Plaintiff repeats all previous allegations as if set forth in full herein.

91.    Defendants have disseminated the Preliminary Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

92.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

93.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

94.     The Preliminary Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

95.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

96.     The Individual Defendants were at least negligent in filing a Preliminary Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy Statement not misleading.

97.     The misrepresentations and omissions in the Preliminary Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of its entitlement to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

98.     Plaintiff repeats all previous allegations as if set forth in full herein.

99.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy Statement was materially misleading to Plaintiff in its capacity as a Company stockholder.

100.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy Statement and nevertheless approved,

ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

101.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of CorePoint's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Preliminary Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

102.    The Individual Defendants acted as controlling persons of CorePoint within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause CorePoint to engage in the wrongful conduct complained of herein. The Individual Defendants controlled CorePoint and all of its employees. As alleged above, CorePoint is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and against the Defendants, as follows:

A.    Enjoining the Proposed Transaction;

B.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.     Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

D.     Directing the Individual Defendants to exercise their fiduciary duties and to comply with the Exchange Act to disseminate a Preliminary Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.     Directing defendants to account to Plaintiff for damages sustained because of the wrongs complained of herein;

F.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: January 17, 2022

**BRODSKY & SMITH**

By: _____

Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*